IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

UNITED STATES OF AMERICA §
§
§
v. §                    Case No. 6:22-cr-22-JDK
§
PETER J. BENNETT §
§

## MEMORANDUM OPINION AND ORDER

Following a jury trial, convicted defendant Peter J. Bennett moved for a judgment of acquittal, or alternatively, a new trial on all counts. Docket No. 103. As explained below, the Court **DENIES** the motion with respect to Count 1 (conspiracy to commit money laundering) and Count 2 (conspiracy to operate an unlicensed money transmitting business). The Court **GRANTS** the motion with respect to Counts 3 and 4 (perjury) because venue in the Eastern District of Texas was improper.

## I.

Peter Bennett is an attorney practicing in Houston, Texas. On December 14, 2022, the Grand Jury charged Bennett with (1) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), (2) conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, and (3) two counts of perjury in violation of 18 U.S.C. § 1621. Docket No. 39. These charges arise out of Bennett's agreement to assist two clients with concealing payments they received in an illegal healthcare kickback scheme.

1

The case was tried to a jury from July 10 to July 14, 2023.  At trial, the Government presented the testimony of eight witnesses, including Bennett's client Robert O'Neal, as well as the case agents, Jack Geren and Danny Luo.  *See* Trial Tr. 7/10/2023 at 162:12–272:6, *id.* 7/11/2023 at 278:6–386:18 (Geren's testimony); *id.* 7/11/2023 at 387:6–535:9 (O'Neal's testimony); *id.* 7/12/2023 at 795:12–825:14, *id.* 7/13/2023 at 836:7–916:21, *id.* 7/14/2023 at 1139:7–1148:11 (Luo's testimony). O'Neal testified that Bennett was his tax attorney and general adviser for several years leading up to the events in question.  *Id.* 7/11/2023 at 394:20–396:13.  From 2015 to 2017, O'Neal received payments for his participation in the kickback scheme. *Id.* 7/11/2023 at 415:14–416:3; Gov't Ex. 155.  O'Neal explained that he wanted to conceal the payments from the Government because it was investigating him in the Western District of Texas for his role in a separate kickback conspiracy.  Trial Tr. 7/11/2023 at 421:10–422:9.  O'Neal informed Bennett of the investigation and sought advice on how to conceal the payments.  *Id.* 7/11/2023 at 422:6–9.  Bennett then created several entities and transactions to assist O'Neal, including transferring the payments to an LLC and then to a trust, both controlled by Bennett, which later transferred the assets to O'Neal.  *Id.* 7/11/2023 at 422:16–427:6; *see also* Gov't Exs. 4–5, 8–9, 10–11, 13, 26–34, 153–61, 300–09, 401, 409–12.  O'Neal also testified that Bennett knew the payments resulted from the unlawful kickback scheme.  Trial Tr. 7/11/2023 at 427:4–6.

To prove the perjury counts, the Government presented evidence that Bennett submitted false statements to the Department of Justice in response to two Civil

Investigative Demands (CIDs).  Gov't Exs. 201–02, 204–06.  The CIDs were part of DOJ's investigation of the kickback scheme, including an investigation of a False Claims Act *qui tam* suit pending in the Eastern District of Texas.  *See* Gov't Ex. 201 at 1.  Agent Geren testified that Bennett's responses to the CIDs were contradictory and "ma[de] no sense."  Trial Tr. 7/11/2023 at 283:15; *see also id.* 7/10/2023 at 262:9–271:9, *id.* 7/11/2023 at 278:7–290:17.  The Government also introduced several exhibits that contradicted Bennett's written responses.  Gov't Exs. 204–05.

Following the close of the Government's case-in-chief, Bennett moved for a judgment of acquittal.  Trial Tr. 7/13/2023 at 917:6–9.  The Court reserved decision on the motion.  *Id.* 7/13/2023 at 934:19–20.

Bennett then called a single witness in his defense:  himself.  Bennett denied knowledge that the payments for O'Neal and Kash were the proceeds of unlawful activity.  *Id.* 7/13/2023 at 961:15–964:7; *see also id.* 7/13/2023 at 971:1–14.  He also testified that the payments he made from the trusts and LLCs for the benefit of O'Neal were loans that O'Neal later repaid.  *Id.* 7/13/2023 at 982:5–983:3, 992:8–18.  Finally, Bennett denied making any false statements under oath and believed his responses to the CIDs were correct.  *Id.* 7/13/2023 at 1002:6–1003:14.

Following a half-day of deliberations, the jury unanimously returned guilty verdicts on all four counts.  Docket No. 91.

Bennett thereafter filed a Motion for Judgment of Acquittal or New Trial "requesting that the Court find the evidence was insufficient to support his

convictions, or, in the alternative, that the interests of justice require the granting of a new trial." Docket No. 103 at 1.

## II.

Federal Rule of Criminal Procedure 29(c) permits a defendant to move for a judgment of acquittal after a guilty verdict. The "relevant question" in deciding a Rule 29 motion "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The standard for a sufficiency claim is high." *United States v. Achobe*, 560 F.3d 259, 263 (5th Cir. 2008). "The jury's constitutional role in deciding criminal trials leaves little room for judicial second-guessing." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc). Review of a jury verdict is therefore "quite limited." *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)). The Court may not "weigh the evidence or assess the credibility of witnesses . . . ." *Burks,* 437 U.S. at 16. Rather, so long as there is "substantial evidence, taking the view most favorable to the Government," the Court must uphold the verdict. *Achobe*, 560 F.3d at 263 (citation omitted).

Federal Rule of Criminal Procedure 33(a) also permits a defendant to seek a new trial "if the interest of justice so requires." *See also Crittenden*, 46 F.4th at 296 ("Trial courts, however, have a different path for setting aside a verdict: ordering a new trial."). Deciding a Rule 33 motion is within the Court's discretion. *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997). This discretion, however, "should be exercised with caution," meaning that a new trial should be granted "only

in exceptional cases." *Id.*; *see also United States v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018) (stating that a new trial is an "exceptional remedy."). Generally, there are two such "exceptional cases" for granting a new trial. *Crittenden*, 46 F.4th at 296–97. The first is when "error infects the trial—perhaps the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions." *Id.* at 296; *see also Hoffman*, 901 F.3d at 552 ("A new trial request can also be based on procedural problems with the trial if they caused a miscarriage of justice."). The second is when the evidence weighs "heavily against the verdict." *Crittenden,* 46 F.4th at 297 (quoting *Robertson*, 110 F.3d at 1118). In considering a new trial, the Court may not "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Robertson,* 110 F.3d at 1118. Rather, a new trial should be granted only if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.*; *see also Crittenden*, 46 F.4th at 297 (stating that the authority to grant a new trial "should be exercised only when the verdict may have resulted in a 'miscarriage of justice.') (citation omitted).

## III.

Count One charged Bennett with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Docket No. 39 at 4–10. Bennett seeks a judgment of acquittal, or alternatively, a new trial on Count One because "the evidence was insufficient" on two of the necessary elements and because "the verdict on Count One was a general verdict." Docket No. 103 at 2–16. Both arguments fail.

## A.

Section 1956(h) criminalizes "conspir[ing] to commit any offense defined in [§ 1956] or § 1957."  In both the indictment and jury charge, the Government alleged that Bennett conspired to violate § 1956(a)(1)(B)(i) and § 1957.  Docket No. 39 at 4–5; Docket No. 88 at 13.  Section 1956(a)(1)(B)(i) prohibits conducting financial transactions involving the proceeds of unlawful activity "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . ."  18 U.S.C. § 1956(a)(1)(B)(i) (cleaned up); *see also* Docket No. 88 at 15 (listing the elements of the statute).  This is also known as "concealment money laundering."  *United States v. Valdez*, 726 F.3d 684, 690 (5th Cir. 2013).  Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity . . . ."  18 U.S.C. § 1957(a).

Bennett argues that the Government "failed to prove the necessary elements of 1) intent to conceal and disguise and 2) that the relevant transactions involved the proceeds of specified unlawful activity."  Docket No. 103 at 2.  Viewing the evidence in the light most favorable to the Government, the Court disagrees.  *Valle*, 538 F.3d at 344.  With respect to concealment, the Government presented evidence that Bennett's clients, Robert O'Neal and Stephen Kash, wanted to hide funds they received for their roles in an unlawful healthcare kickback scheme.  The funds were therefore sent to trusts and LLCs in Bennett's name and under his control.  Gov't Exs. 4–5, 8–9, 10–11, 13, 26–34, 153–55, 158, 401, 409–12.  From there, Bennett made

numerous payments on behalf of O'Neal and Kash, including purchasing a car, renovating a home, and making charitable donations.  Gov't Exs. 156–58, 159–161, 300–09.  O'Neal, moreover, specifically testified that the purpose of these transactions was to conceal the funds from the Government, which was investigating O'Neal in the Western District of Texas.  Trial Tr. 7/11/2023 at 423:3–5, 424:5–7, 470:16–22; *see also id.* 7/11/2023 at 427:10–16 (O'Neal testifying that Bennett created a similar arrangement for Kash).  Indeed, O'Neal testified that Bennett created the trusts and LLCs to "shield [O'Neal] from the Western District I'll call it examination or inquiry . . . It was his suggestion, a trust.*"  Id.* 7/11/2023 at 423:4–8; *see also id.* 7/11/2023 424:5–7 (O'Neal testifying that the entities were "established for my benefit, to hide and do business, that didn't show my name.").  *See also, e.g.,* Gov't Exs. 4–5, 8–11, 13, 26–34.

This is classic money laundering.  The transactions involved a third party (Bennett) and a series of transfers (hospital to "management services organization" to LLC to trust) to "make it more difficult for the government to trace" the funds. *United States v. Brown*, 553 F.3d 768, 787 (5th Cir. 2008); *see also United States v. Pendleton*, 761 F. App'x 339, 347 (5th Cir. 2019) (affirming a concealment money laundering conviction because the defendant, "acting as the third party in a complicated financial transaction, bought assets and washed drug money for [another person] to convert it into legitimate funds.").

The Government also presented evidence that the transactions involved the "proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(B)(i).  Several

witnesses testified, for example, that the transactions included illegal remunerations (*i.e.*, kickbacks) in violation of 42 U.S.C. § 1320a-7b(b) and conspiracy to commit illegal remunerations in violation of 18 U.S.C. § 371.  *See* Trial Tr. 7/10/2023 at 196:22–201:16, 233:14–256:1; *see also id.* 7/11/2023 at 403:18–419:22.  O'Neal explicitly stated that he was receiving money, indirectly, "from the hospitals that were receiving referrals from the physicians for the lab services."  *Id.* 7/11/2023 at 414:21–415:1.  The Government introduced copious evidence corroborating that testimony, including the trusts' and LLCs' bank records, invoices billed by those entities to the unlawful management services organizations, payments from the organizations to the trusts/LLCs, and outgoing payments from the trusts/LLCs for the benefit of O'Neal and Kash.  *See* Gov't Exs. 14–15, 21, 23–34, 155–55, 158, 401, 409–12.  This evidence was more than sufficient to establish that the transactions involved the proceeds of unlawful activity.  *See, e.g., United States v. Tencer*, 107 F.3d 1120, 1131–32 (5th Cir. 1997).[1]

---

[1] Bennett cites *United States v. Loe*, 248 F.3d 449, 466–67 (5th Cir. 2001), in which the Fifth Circuit addressed payments from a "commingled" bank account containing both "clean" and "dirty" (*i.e.*, "proceeds of specified unlawful activity") money.  Bennett argues that some of the payments to O'Neal and Kash involved privately-insured patients, which he claims did not violate the Anti-Kickback Statute and were thus "clean," and that the Government failed to specify which payments were "clean" and which were "dirty."  Docket No. 103 at 11–14.  But the Government presented evidence that all of the payments to O'Neal and Kash were "dirty" because they compensated O'Neal and Kash for their roles in the unlawful kickback scheme.  Witnesses testified, moreover, that the payments for privately-insured patients were made in part to induce the referrals of Medicare and Tricare patients.  Trial Tr. 7/11/2023 at 315:23–316:1 (Geren stating that "it seemed to be a package deal the way these things operated."); *see also id.* 7/10/2023 at 183:4–7, *id.* 7/11/23 at 419:16–18.  *Loe* is therefore inapposite.

Bennett's first challenge to the guilty verdict on Count One fails.  The jury could have reasonably found that Bennett conspired to commit a violation of either § 1956(a)(1)(B)(i) or § 1957.

## B.

Bennett also argues that Count One was "duplicitous" because "it alleged two crimes involving two different punishments"—conspiracy to violate either § 1956(a)(1)(B)(i), which provides for a term of imprisonment of not more than twenty years, or § 1957, which provides for an imprisonment term of not more than ten years. Docket No. 103 at 15–16.  The verdict form, moreover, "gives no indication of which statute the jury found was violated," and thus the sentence may not exceed the lower of the two potentially applicable maximum terms.  *Id.* at 16 (citing *United States v. Conley*, 349 F.3d 837, 840 (5th Cir. 2003)).

As an initial matter, Bennett waived this argument by failing to object to the indictment before trial or to the jury charge before the verdict was returned.  *See, e.g., United States v. Elam*, 678 F.2d 1234, 1251 (5th Cir. 1982) (holding "that objections to the indictment, such as duplicity, must be raised prior to trial."); *United States v. Mancuso*, 423 F.2d 23, 29 (5th Cir. 1970) ("Nor was timely objection to the court's charge made.  Failure to do so prior to the return of the verdict constitutes waiver of the objection.") (citing FED. R. CRIM. P. 30).

In any event, as noted above, the evidence sufficiently established that Bennett conspired to violate both § 1956(a)(1)(B)(i) and § 1957.  The nature of the general verdict therefore does not entitle Bennett to an acquittal or a new trial based on the claimed insufficiency of the evidence.  *See United States v. Mauskar*, 557 F.3d

219, 228–29 (5th Cir. 2009).  Nor does Bennett argue that the jury was divided about which offense he conspired to commit.  *United States v. Sanjar*, 876 F.3d 725, 737 (5th Cir. 2017) ("The most common way [duplicity] harms a defendant is when it allows a nonunanimous verdict with all jurors finding the defendant guilty but not necessarily of the same offense.").  The Court here, moreover, instructed the jurors that they needed to agree about which underlying offense Bennett conspired to commit, which would have cured any problem.  Docket No. 88 at 17–18; *see also United States v. Holley*, 942 F.2d 916, 925–26 (5th Cir. 1991) ("In the routine case, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability.") (citation omitted); *Mauskar*, 557 F.3d at 227 ("This [general unanimity] instruction was enough to guard against a non-unanimous verdict."); *United States v. Starks*, 472 F.3d 466, 471 (7th Cir. 2006) ("[T]he use of jury instructions informing the jury of the need for an unanimous verdict can cure an otherwise duplicitous indictment.").

Finally, "it [is] 'well settled that the conspiracy may contemplate several offenses.'"  *Sanjar*, 876 F.3d at 737 (quoting *Burton v. United States*, 175 F.2d 960, 963 (5th Cir. 1949)).  "That an indictment alleges more than one means by which conspirators 'sought to accomplish [a] scheme does not render it duplicitous.'"  *Mauskar*, 557 F.3d at 226 (citing *United States v. McDermot*, 1995 WL 371036, at *4 (5th Cir. June 5, 1995)); *see also United States v. Jenkins*, 2018 WL 3910844, at *2 (E.D. Tex. July 26, 2018) (stating that it is perfectly acceptable for "an indictment

alleging conspiracy . . . [to allege] one or more means by which the conspirators sought to accomplish a scheme.").

Bennett's second challenge to Count One also fails.

## IV.

Count Two charged Bennett with conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1960.  Docket No. 39 at 11–17.  Bennett seeks a judgment of acquittal or alternatively a new trial on Count Two because "there is insufficient evidence he operated a money transmitting business" and because § 1960 is "unconstitutionally vague."  Docket No. 103 at 17.  Both arguments are without merit.

### A.

Section 1960(a) states:

> Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1960(a).  The term "unlicensed money transmitting business" means "a money transmitting business which affects interstate or foreign commerce in any manner or degree" and, as relevant here, "is operated without an appropriate money transmitting license" as required by state or federal law.  *Id*. § 1960(b)(1)(A).  Section 1960 further provides that "the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers . . . by wire, check, draft, facsimile, or courier."  *Id*. § 1960(b)(2).

11

Bennett first argues that he merely transferred funds on behalf of two of his clients, Robert O'Neal and Stephen Kash—not the public at large.  Docket No. 103 at 18–22 ("[T]hese were both clients of Mr. Bennett's firm, and there is no evidence that Mr. Bennett would transmit funds for general members of the public . . . .").  Bennett thus contends that the "evidence was insufficient to prove that [he] ran a money transmitting business that transferred funds on behalf of the public."  *Id.* at 21.  Courts are split over whether "on behalf of the public" is an essential element of the offense under § 1960.  *Compare United States v. $215,587.22 in U.S. Currency*, 306 F.Supp.3d 213, 218 (D.D.C. 2018) (holding that it is an essential element) *with United States v. Singh*, 995 F.3d 1069, 1077 (9th Cir. 2021) (holding that it is not an essential element), *and United States v. Neumann*, 2022 WL 3445820, at *6 (S.D.N.Y. 2022) (same).  But the Court need not address that issue today because the Government presented sufficient evidence to prove the element here.

As Bennett notes in his motion, the term "public" can mean "of or relating to business or community interests as opposed to private affairs."  Docket No. 103 at 20–21 (citing *Public*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/public (last visited January 9, 2024)).  And here, the uncontroverted evidence showed that Bennett was transmitting (and receiving) funds on behalf of his law firm clients.  Gov't Exs. 26–34, 153–55, 158, 300–09, 401, 409–12.  Bennett did so for compensation—he was paid by the clients, and he retained fees for his work managing the LLCs and trusts.  *See* Gov't Exs. 8–9 (trust agreements providing that Bennett was entitled to a five percent commission); 409 (invoice from

Bennett to one of the LLCs for services he rendered).  The transfers, moreover, occurred "as part of a commercial or business relationship," not with Bennett's "own money or for family or personal acquaintances." *$215,587.22*, 306 F. Supp at 218. *See also, e.g., United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) (stating that a money transmitting business is one that "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country."); *Singh*, 995 F.3d at 1078 (adopting *Velastegui*'s definition).  It does not matter that Bennett transferred funds for only two clients because even "a few disparate, isolated instances" may suffice to support a conviction under § 1960.  *United States v. Altareb*, 758 F. App'x 116, 120–21 (2nd Cir. 2018) (affirming conviction for violating § 1960 where defendant made just six transfers on behalf of two individuals).

Bennett also argues the Government failed to prove that he was required to obtain a money transmitting license under Texas law or to be registered under federal law.  Docket No. 103 at 22–24.  Texas law requires a license for "engag[ing] in the business of money transmission in this state."  TEXAS FIN. CODE § 151.302(a).[2] Engaging in the business of money transmission means that "the person receiv[ed] compensation or expect[ed] to receive compensation, directly or indirectly, for conducting money transmission."  *Id.* § 151.302(b). "Money transmission" means "the receipt of money or monetary value by any means in exchange for a promise to make

---

[2] After the parties filed their briefs, a new version of Chapter 151 took effect.  S.B. 895, 88th Legislature (Tex. 2023).  Neither side argues that the new version governs here or that it would change the analysis.  Accordingly, the Court will cite to the version of Chapter 151 in effect during the relevant period.

the money or monetary value available at a later time or different location." *Id.* § 151.301(b)(4). Similarly, federal law requires that any person "who owns or controls a money transmitting business shall register the business . . . with the Secretary of the Treasury." 31 U.S.C. § 5330(a).

As discussed above, the Government presented evidence that Bennett transferred money for clients for compensation. The Government also presented evidence that neither Bennett nor his law firm was licensed under Texas law or registered under federal law. *See* Gov't Exs. 100–01, 103; Trial Tr. 7/11/2023 at 545:8–548:5, *id.* 7/12/2023 at 579:11–581:15. That is sufficient to satisfy § 1960.

Bennett claims that no law firm or lawyer has ever registered as a money transmission business under Texas law. Docket No. 103 at 24. But that does not negate the evidence showing that Bennett was required to register and failed to do so. Bennett also cites Section 151.003 of the Finance Code, which states that "a trust company" organized under Texas law is "not required to be licensed under this chapter." Bennett, however, was transmitting money as an individual or a law firm, not a trust company. *See* Trial Tr. 7/13/2023 at 1074:9–1090:21 (testimony from Government's expert witness on trusts, stating that Bennett's trusts were highly atypical of trusts in Texas and that they "[j]ust didn't make any sense to me.").[3] In any event, even if Bennett were not required to be licensed under Texas law, he was

---

[3]  Further, Section 151.003 did not include an exception for "a trust company" until 2017, after Bennett had committed the majority of his unlawful activities here. *See* Tex. Fin. Code § 151.003 (2015) (amended 2017) (current version at Tex. Fin. Code. § 152.004).

required to register under federal law, and Bennett does not argue otherwise.  *See* 31 U.S.C. § 5330.

Accordingly, the jury could have reasonably concluded that Bennett conspired to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.

## B.

Bennett next argues that § 1960 is "unconstitutionally vague as applied to this case."  Docket No. 103 at 25.  Although Bennett did not raise this argument before or during trial, he now contends that construing the statute to cover his conduct "would render the statute unconstitutionally vague and violate due process."  *Id*. at 26.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness so that an ordinary person may understand what conduct is actually prohibited."  *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  This does not mean that every possible application of the statute must be predictable on its face.  Instead, "[o]nly a reasonable degree of certainty" about the statute's future application is required.  *Id.*  A vagueness challenge, moreover, "cannot be used as a shield by someone who is already intent on wrongdoing."  *Id.  See also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 581 (5th Cir. 2012) ("[T]he elementary rule [is] that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (citing *Gonzalez v. Carhart*, 550 U.S. 124, 153 (2007)).

15

Section 1960 is not unconstitutionally vague.  The key terms, as discussed above, are defined in the statute, and an ordinary person can understand what conduct is prohibited.  Indeed, a plain reading of the statute would inform anyone in Bennett's shoes that transmitting funds on behalf of individuals for compensation is covered—and that if he fails to comply with state or federal licensure law, then he is in violation of § 1960.  Other courts agree.  *See Velastegui*, 199 F.3d at 595 (holding that § 1960 provides sufficient notice for constitutional purposes); *United States v. Harmon*, 2021 WL 1518344, at *9 (D.D.C. April 16, 2021) (same); *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 97–99 (D.D.C. 2008) (same).  *C.f. United States v. Dimitrov*, 546 F.3d 409, 412–16 (7th Cir. 2008) (holding that the lack of a *mens rea* element does not render § 1960 vague); *United States v. Talebnejad*, 460 F.3d 563, 568–70 (4th Cir. 2006) (rejecting Defendants' argument that § 1960 is vague because it does not allow ignorance of state licensing requirements as a defense); *United States v. Emilor, S.A.*, 2008 WL 2152279, at *16 (E.D. Tex. May 21, 2008) (holding that conflicting interpretations of § 1960 from different government agencies does not render the statute vague).

Bennett's second challenge to Count Two fails.

## V.

Counts Three and Four charged Bennett with perjury in violation of 18 U.S.C. § 1621.  Docket No. 39 at 18–21.  Bennett now moves for acquittal, arguing that venue in the Eastern District of Texas was improper.  Docket No. 103 at 28–37.

## A.

Article III of the Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. CONST., art. III, § 2, cl. 3.  The Sixth Amendment reinforces this requirement by stating that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." *Id.* amend. VI.  *See also, e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999); *United States v. Davis*, 666 F.2d 195, 198–99 (5th Cir. Unit B 1982).[4]  Likewise, Federal Rule of Criminal Procedure 18 states:  "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  The Government "need only show by a preponderance of the evidence that the trial is in the same district as the criminal offense." *Davis*, 666 F.2d at 199.

Venue is proper at the *locus delicti*, which is determined by "the nature of the crime alleged and the location of the act or acts constituting it." *Rodriguez-Moreno*, 526 U.S. at 279 (internal quotation marks omitted); *accord United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022).  Based on *Rodriguez-Moreno*, the Court performs a two-step inquiry.  *See United States v. Clenney*, 434 F.3d 780, 781 (5th

---

[4] Article III, § 2, cl. 3, is "a venue provision, since it fixes the place of trial," while the clause in the Sixth Amendment "is a vicinage provision, since it deals with the place from which the jurors are to be selected."  Wright & Miller, 2 FED. PRAC. & PROC. CRIM. § 301 (4th ed.).  The Vicinage Clause "reinforces the coverage of the Venue Clause because, in protecting the right to a jury drawn from the place where a crime occurred, it functionally prescribes the place where a crime must be held." *Smith v. United States*, 599 U.S. 236, 245 (2023) (cleaned up) (citing *Rodriguez-Moreno*, 526 U.S. at 278).  These rights were "highly prized by the founding generation," which "forcefully objected to trials in England before loyalist juries."  *Id.* at 247–48.

Cir. 2005).  First, it identifies the essential conduct elements of the relevant offense by "scrutiniz[ing] the statute of conviction."  *Id*. at 781.  Second, the Court "discern[s] the location of the commission" of the essential conduct elements to ensure it is the same location as the trial.  *Id*.  The Court should "view[] the evidence in the light most favorable to the Government and mak[e] all reasonable inferences and credibility choices in favor of the jury verdict" when determining this question post-verdict.  *Davis*, 666 F.2d at 199.

### B.

Applying the two-step inquiry of *Rodriguez-Moreno*, the Court concludes that venue is not proper in the Eastern District of Texas.

**1.  The essential conduct elements.**  Section 1621(1) states:

> Whoever—(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true.

Section 1621(1) consists of five elements:  first, the defendant testified or subscribed written testimony; second, the defendant did so having taken an oath or under penalty of perjury; third, the testimony or declaration was false; fourth, the testimony or declaration was material; and fifth, the defendant knew at the time that the testimony or declaration was false.  *See id*.; *see also* Docket No. 88 at 23–24; *Williams v. United States*, 239 F.2d 748, 749 (5th Cir. 1957).  The fifth element is a mens rea element irrelevant to venue.  *See Rodriguez-Moreno*, 526 U.S. at 279; *Clenney*, 434

F.3d at 782.  And the third and fourth elements are not elements of the defendant's conduct.  *See Smith*, 22 F.4th  at 1243.

The essential conduct elements of § 1621 are therefore testifying or subscribing written testimony and taking an oath or acting under penalty of perjury.  *See United States v. Hersch*, 850 F. Supp. 483, 488 (E.D. Va. 1994) (holding that venue for a § 1621 offense is proper where the defendant "having first taken an oath, told a lie"); *accord Smith*, 22 F.4th at 1243; U.S. Dept. of Justice, Criminal Resource Manual § 1754,  https://www.justice.gov/archives/jm/criminal-resource-manual-1754-perjury-cases-special-problems-and-defenses-venue (last visited January 9, 2023) ("Venue for perjury charges generally lies in the district where the false oath was made.").

**2. Location.**  The commission of these elements did not occur in the Eastern District of Texas.  Rather, it's undisputed that Bennett committed these acts in Houston, which is in the Southern District of Texas.  Trial Tr. 7/10/2023 at 9:5–8; *see also* Gov't Exs. 200–01 (showing that the CIDs were sent to Bennett's Houston office); Trial Tr. 7/10/2023 at 157:10–159:8 (stipulated facts stating that the CIDs were notarized by Tramy T. Vo); *id.* 7/12/2023 at 608:9-18 (Bennett's legal partner testifying that Vo was an employee in their Houston office).  Indeed, Bennett's uncontroverted testimony was that he finalized the responses to the Government's CIDs and attested to their accuracy at his law firm in Houston—and then mailed or FedEx'ed them from there to the Department of Justice in D.C.  *Id.* 7/13/2023 at 1056:2–10.

19

The Government argues that venue is nevertheless proper in the Eastern District of Texas because there was a "pending proceeding that [was] affected by the perjury" in this District.  Docket No. 112 at 23.  The Government is referring to the investigation of a *qui tam* lawsuit pending in the Sherman Division.  *See id*. at 24; *United States, ex rel. STF, LLC v. True Health Diagnostics, LLC*, Case No. 4:16-cv-547-ALM (E.D. Tex.).  The Government relies primarily on a case decided before *Rodriguez-Moreno*, in which the Second Circuit held that "perjury in one district in a proceeding ancillary to a proceeding in another district may be prosecuted in either." *United States v. Reed*, 773 F.2d 477, 483 (2d Cir. 1985).

But *Reed* involved perjury under a different statute, 18 U.S.C. § 1623, which expressly prohibits lying under oath "in any proceeding before or ancillary to any court or grand jury."  *See id*. at 482; *Hersch*, 850 F. Supp. at 488–89 (noting that *Reed*'s analysis of venue under § 1623 does not apply to a charge under § 1621).  There is no such language in § 1621.  *Reed*, moreover, applied a "substantial contacts rule" for determining venue that the Fifth Circuit has never adopted.  *Id*. at 481; *United States v. Bays*, 2014 WL 12691742, at *3 n.2 (N.D. Tex. April 8, 2014).  Indeed, *Reed* is arguably inconsistent with *Clenney* in which the Fifth Circuit rejected the argument that venue in a parental kidnapping case could lie in the district where the effects were most felt—the district where the custodial mother and child resided.  *See Clenney*, 434 F.3d at 782.  The court explained that venue was proper only where the essential conduct element occurred, which was where the father took the child outside the United States.  *Id.; see also Smith*, 22 F.4th at 1244 (venue in a theft-of-trade-

secrets case does not lie in the district where the owner of the trade secret resides because the statute "does not define any essential conduct element of the offense in terms of its effects on the owner").

The Government also argues that its interpretation "aligns with congressional intent" because § 1621 applies "whether the statement or subscription is made within or without the United States." Docket No. 112 at 23; 18 U.S.C. § 1621. "If the defense were right that a district court lacks venue for any false statement made outside of that district," the Government contends, "no defendant could be prosecuted in any district for a false statement that he made outside the United States." Docket No. 112 at 23–24. But Congress has provided a special venue provision for just such a scenario: 18 U.S.C. § 3238, which provides that the trial of any crime committed outside the jurisdiction of "any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought." *See also* U.S. CONST. art. III, § 2, cl.2 ("[W]hen not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.").

Accordingly, Bennett's convictions for violating § 1621 must be vacated. Although Bennett requests acquittals of Counts 3 and 4, "[t]he remedy for improper venue is vacatur of the conviction, not acquittal or dismissal with prejudice." *Smith*, 22 F.4th at 1244, *aff'd by Smith*, 599 U.S. at 239 (holding that the Double Jeopardy Clause does not bar a retrial "when a conviction is reversed because the prosecution occurred in the wrong venue"); *see also Davis*, 666 F.2d at 202 (ordering vacatur of a conviction that occurred in improper venue); *United States v.*

*Fortenberry*, 2023 WL 8885105, at *2 (9th Cir. 2023) (reversing a conviction of perjury based on improper venue "without prejudice to retrial in a proper venue.").

## VI.

For the reasons stated above, Bennett's motion is **DENIED** with respect to Counts One and Two and **GRANTED** with respect to Counts Three and Four. Bennett's convictions on Counts Three and Four are **VACATED**.

So **ORDERED** and **SIGNED** this **9th**  day of **January, 2024.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE